Merrimack
No. 80-305

DAVID J. CLOUTIER

v.

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.

October 30, 1981

916

*Gallagher, Callahan & Gartrell P.A.*, of Concord (*Edward E. Shumaker, III*, on the brief and orally), for the plaintiff.

*Sulloway, Hollis & Soden*, of Concord (*Robert M. Larsen* on the brief and orally), for the defendant.

DOUGLAS, J. In this appeal we essentially are asked to decide whether the plaintiff sufficiently established a public policy to satisfy the test for the wrongful discharge of an employee set forth in *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 414 A.2d 1273 (1980). Our review of the record reveals that there was a sufficient nexus between the public policy asserted by the plaintiff and the reasons for his discharge. Accordingly, we affirm the trial court.

From 1939 until his termination on January 13, 1977, with the exception of three years out for military service, David Cloutier, the plaintiff, was employed by the Great Atlantic and Pacific Tea Company (A & P), the defendant. During this period he held a variety of positions, rising from a clerk to a store manager. Evidence was presented at trial that he had been an exemplary employee who had received several awards and commendations, in addition to numerous increases in salary.

In July 1975, A & P opened a new store in Tilton and awarded the position of manager to the plaintiff. Although the employees of

the store were covered by a collective bargaining agreement, the plaintiff, because of his managerial position, was excluded from coverage under the agreement. *See* 29 U.S.C. §§ 152(11) and 164(a) (1976). Based on the plaintiff's assertion that "it was very dangerous up here," the defendant gave permission to the plaintiff to secure protection for company employees making cash deposits on their way from the new store to the bank. Soon thereafter, this protection was provided by local police at a charge of $3 per trip. Approximately five to six months later, the defendant notified the plaintiff that the police protection would be terminated. It appears from the testimony at trial that termination of protection at that time was consistent with company policy.

The testimony of the plaintiff and of Mr. Cote, the assistant manager of the store, indicated that both men had complained to their supervisors about the discontinuance of police protection. The plaintiff testified that his supervisors had told him to lock up any funds for deposit in the safe located in the store if any of the employees working under the plaintiff were afraid to go to the bank at night or during the weekend. An A & P superintendent stated that company policy after the termination of police protection required two daily deposits to be made by two store employees. The evidence indicated that the plaintiff himself continued to make regular deposits, although there was testimony that some of the weekend deposits were not always being made. Additionally, the collective bargaining agreement stated that store employees could not be required to use their vehicles to conduct employer business.

On the evening of Saturday, December 18, 1976, the plaintiff completed his seventh straight day of work at the store, taking a deposit to the bank before returning home. The next day, Sunday, was his scheduled day off. At midnight on Sunday, December 19, the plaintiff was called and informed that the store had been broken into and the safe burglarized. At the scene he learned that no deposits had been made that day and that the loss had totalled approximately $30,000. The funds had not been placed in a "barrel safe" as was required by company policy.

After an investigation, the defendant suspended the plaintiff, Mr. Cote, and the store bookkeeper. On January 17, 1977, the plaintiff was discharged because of his "violation of company bookkeeping procedure." The plaintiff then brought a wrongful discharge action against the defendant. After the Trial Court (*Cann*, J.) had denied the defendant's pretrial motion to dismiss, subsequent motion for non-suit, and motion for a directed verdict, the case was submitted to the jury, which returned a verdict for

the plaintiff in the amount of $92,000 from which the defendant now appeals. The defendant argues that the trial court erred in denying its motion for a directed verdict at the close of all the evidence because the plaintiff did not aver a specific, statutory public policy protecting his conduct and giving rise to a wrongful discharge action.

■ The prevailing rule in the early nineteenth century presumed that an indefinite private hiring carried with it duties and responsibilities for both the master and servant. These early "customary obligations were [subsequently] recast in terms of the emerging theory of contract." Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 HARV. L. REV. 1816, 1824 (1980). Common law then evolved to the point where, in the absence of an employment contract, both parties were free at any time to terminate the employment relationship, with or without cause. American jurisprudence adopted what is commonly referred to as the "at-will" rule:

> "With us the rule is inflexible, that a general or indefinite hiring is *prima facie* a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. A hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at the rate fixed for whatever time the party may serve. . . . [I]t is an indefinite hiring and is determinable at the will of either party, and in this respect there is no distinction between domestic and other servants."

H. G. WOOD, A TREATISE ON THE LAW OF MASTER AND SERVANT § 136, at 283–84 (2d ed. 1886); *see Monge v. Beebe Rubber Co.*, 114 N.H. 130, 136, 316 A.2d 549, 553 (1974) (Grimes, J., dissenting). Although "the new climate prevailing generally in the relationship of employer and employee," *Monge v. Beebe Rubber Co.*, 114 N.H. at 133, 316 A.2d at 551, has led to substantial qualifications to the "at-will" rule, *e.g., Petermann v. International Brotherhood, Etc.*, 174 Cal. App. 2d 184, 344 P.2d 25 (1959); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973); *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975); Civil Rights Act of 1964, tit. VII, 42 U.S.C. § 2000e *et seq.* (1976), the rule retains its vitality in circumstances other than those carved out by legislative

920

and judicial exception and those in which collective bargaining agreements apply.

■ Seven years ago, in *Monge v. Beebe Rubber Co.*, 114 N.H. at 133, 316 A.2d at 551, the majority noted that "the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two," concluding that "a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract." The rationale underlying *Monge* is that there is an implied covenant in every contractual relationship that the parties will carry out their obligations in good faith. *Bursey v. Clement*, 118 N.H. 412, 414, 387 A.2d 346, 347–48 (1978); *Seaward Construction Co. v. City of Rochester*, 118 N.H. 128, 129, 383 A.2d 707, 708 (1978). In *Howard v. Dorr Woolen Company*, 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980), "[w]e construe[d] *Monge* to apply only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn," thereby limiting the *Monge* holding to the "public policy" exception. "[U]nless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause." *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505, 512 (1980). Accordingly, we must determine whether the plaintiff has articulated a public policy sufficient to give rise to a cause of action in tort under *Howard* and, therefore, sufficient to withstand the defendant's motion for a directed verdict. It is here that we part company with the dissent.

■ A trial court may grant a directed verdict "only when the evidence and all reasonable inferences therefrom, construed most favorably to the party opposing the motion, would not enable a jury to find for that party." *London v. Perreault*, 118 N.H. 392, 394, 387 A.2d 342, 344 (1978); *Amabello v. Colonial Motors*, 117 N.H. 556, 561, 374 A.2d 1182, 1185 (1977). The defendant's motion could only have been granted if the trial court found that the plaintiff's claim was completely without merit. This stringent test has not been met. Because we conclude that sufficient evidence was presented to enable the jury to find for the plaintiff, we affirm the trial court's decision denying the defendant's motion for a directed verdict.

■ The plaintiff has articulated a public policy sufficient to give rise to a cause of action under *Howard*. *Howard* and *Monge* together impose a two-part test which plaintiffs must meet to establish a wrongful discharge cause of action. First, the plaintiff must show that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment. *Monge v. Beebe Rubber Co.*, 114 N.H. at 133, 316 A.2d at 551. The plaintiff presented evidence from which reasonable persons could find that the defendant acted with bad faith, malice or retaliation.

The defendant's termination of the plaintiff's employment purportedly was because he "had been negligent in following company policies and directives with regards [sic] to handling of company funds. . . ." The record, however, is replete with testimony indicating that the defendant's loss occurred because of actions at least condoned by A & P. Initially, at the plaintiff's urging, the defendant agreed to provide police protection to employees delivering deposits to the bank, but after five or six months police protection was ended because the defendant "wanted to save costs." The cost saving was the insignificant sum of $3 per trip, a total of $6 per day. During the period when police protection was given, deposits were made regularly, even in the plaintiff's absence. When police protection ended, the plaintiff discovered that the employees he supervised were afraid of getting hurt while making deposits, and he complained to his supervisors that the defendant was "jeopardizing [his] help's lives." A & P never took action. The plaintiff's supervisors, however, told him that if any employees feared for their lives they could leave money in the safe overnight and deposit it the next day. The defendant thus condoned the practice of leaving money in the safe, a practice that the defendant now claims violated company policy.

■ The above excerpts from the record disclose that A & P was willing to terminate a procedure intended to guarantee the safe and regular delivery of deposits to the bank in order to save $3 per trip to the bank. Ironically, the defendant reinstituted the police accompaniment immediately after the burglary. Discharging the plaintiff because a burglary occurred, when the defendant's loss resulted from actions it condoned, could be found to involve bad faith and retaliation under *Monge*.

■ Bad faith could also be concluded from the manner in which the plaintiff was discharged. After thirty-six years of employment, the plaintiff was suspended after a five-minute meeting and then discharged in an equally cursory manner. A & P never informed the plaintiff of the allegations against him. The

manner in which A & P notified the plaintiff of his discharge suggests that A & P acted with malice towards the plaintiff.

■■ The burglary occurred on the plaintiff's day off. The assistant manager on duty admits that he forgot to make the Sunday deposit; yet, after a brief suspension, the assistant manager was reinstated while the plaintiff was not. The defendant's rationale for discharging the plaintiff and not the assistant manager is that the plaintiff was responsible for cash in the defendant's store "at all times." The assistant manager on duty when the burglary occurred, however, was covered by a collective bargaining agreement stating that "[n]o employee shall be required to use his personally owned vehicle to conduct company business." Because A & P had no company car, no one but the plaintiff could be required to make deposits. Thus, the plaintiff was always responsible for cash, even on his day off, and could not delegate that responsibility. Certainly, under these circumstances, bad faith could be found to have motivated the defendant to discharge the plaintiff, particularly in light of the fact that A & P had administered discipline only three times as a result of the ninety-six robberies that had occurred in the defendant's various stores during the past five years.

■■ ■■ Second, the plaintiff must demonstrate that he was discharged because he performed an act that public policy would encourage, or refused to do something that public policy would condemn. *Howard v. Dorr Woolen Company*, 120 N.H. at 297, 414 A.2d at 1274. The defendant insists that *Monge* and *Howard* demand a statutory expression of public policy. We did not restrict our holding in *Howard* to situations involving a public policy enunciated in a statute. Public policy exceptions giving rise to wrongful discharge actions may also be based on non-statutory policies. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980). Nor did we use the test now advocated by the dissent of a "strong and clear public policy."

The trial record supports a finding that the plaintiff was discharged for conduct that public policy would encourage. The plaintiff testified that the Tilton A & P was in a "very dangerous" area. It was one of two occupied stores in an empty shopping center and was open late at night. For several months after the store opened, the defendant provided employees with police protection during deposit trips to the bank, two miles away. When this protection was terminated, the plaintiff complained that the defendant was "jeopardizing my help's lives." The defendant did not respond, nor did it advise the plaintiff about any other cash control procedures, although it did inform the plaintiff that employees

could leave money in the safe overnight if they were afraid to go to the bank. Because employees were afraid to make late night trips to the bank, deposits were not made daily as they had been when police protection was provided. The plaintiff did not force the employees working under him to make deposits on his day off, so cash accumulated in the safe on those days.

As the plaintiff argued at trial, the public policy supporting his claim derives from 29 U.S.C. § 654(a), the Occupational Safety and Health Act of 1970. An employer has the duty to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a). The defendant, therefore, had a duty to provide the plaintiff and his fellow employees with a safe work environment. The defendant could be found to have breached this duty by requiring the plaintiff to travel to the bank, unprotected, with substantial sums of money. Though A & P could not require the assistant manager to make deposits due to the collective bargaining agreement, Mr. Cote, the assistant manager, voluntarily made some deposits in order to be "helpful." He, too, was subjected to dangerous working conditions. By creating a hazardous environment, the defendant ignored OSHA policy. The plaintiff, however, enforced the OSHA directive by not forcing those in charge in his absence to imperil themselves by making deposits. However, with or without the existence of OSHA, the facts before us support the conclusion that the plaintiff was discharged for furthering the laudable public policy objective of protecting the employees who worked under him.

An additional public policy supports the plaintiff's position. A & P holds the store manager "responsible for all cash and other store funds at all times." The plaintiff was discharged because the defendant construed "at all times" literally, holding the plaintiff responsible when he was not present, even though A & P did not provide those in charge with an alternative means of depositing store funds. A & P thus held the plaintiff responsible for funds though no one but the plaintiff could have been required to deposit them. In essence, the defendant penalized the plaintiff for taking his regularly scheduled day off. A & P, however, is required by law to give employees a day of rest in accordance with RSA 275:33. We fail to see how the plaintiff is given a day of rest when he is responsible "at all times" and is prevented by company policy from delegating the task of depositing funds. We hold that the plaintiff cannot be discharged for some action or failure to act dur-

ing his regularly scheduled day off, when to do otherwise would deprive him of the day off, something which public policy encourages and the law commands. The trial court was correct in denying the defendant's motion for a directed verdict.

■ The defendant next argues, and the dissent asserts, that the trial court erred in permitting *the jury* to determine whether a public policy existed. In *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 809, 395 A.2d 843, 847–48 (1978), a products liability action, we noted that the issue of the dangerousness of a product requires a multifaceted balancing process involving evaluation of many conflicting factors. We held that reasonableness, foreseeability, utility, and similar factors were questions of fact for jury determination. *Id.* We likewise have unanimously held in the area of libel law that the question of who is a "public figure" or "public official" are questions best left to the jury. *McCusker v. Valley News*, 121 N.H. 258, 260–61, 428 A.2d 493, 495 (1981). The existence of a "public policy" also calls for the type of multifaceted balancing process that is properly left to the jury in most instances.

The First Circuit, in the context of a negligence action, described the role the jury plays when reasonable persons could differ as to the inferences to be drawn from facts: "[I]t is deemed wise to obtain the judgment of the jury, reflecting as it does the earthy viewpoint of the common man—the prevalent sense of the community. . . ." *Marshall v. Nugent*, 222 F.2d 604, 611 (1st Cir. 1955). We believe it best to allow the citizenry, through the institution of the American jury, to strike the appropriate balance in these difficult cases. Though a public policy could conceivably be so clear as to be established or not established as a matter of law, in this case it was properly a question of fact for jury determination.

We find no error in the trial judge's instruction directing the jury that it could find a public policy if *Monge* and *Howard's* two-prong test were supported by the facts.

*Affirmed.*

BOIS, J., dissented; BATCHELDER, J., did not sit; the others concurred.

BOIS, J., dissenting: I cannot find a strong and clear public policy to support the majority's decision and therefore respectfully dissent.

The standard law rule universally adopted and still applicable in modern American jurisprudence is that an employment contract at will can be legally terminated by either party, at any time, with or without cause. The basis for the rule is found in the principles of mutuality and freedom of contract which permit individuals and employers to terminate the employment relationship, in the absence of any statutory prohibition, limiting agreement of the parties, or judicial exception. "Parties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." *Mills v. Nashua Federal Savings and Loan Ass'n*, 121 N.H. 722, 433 A.2d 1312 (1981).

New Hampshire, and approximately a dozen other states, have created judicial exceptions restricting the employer's right to terminate the employment relationship. In *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), this court recognized the tort of wrongful discharge, and held that an employee, fired for resisting the sexual advances of her foreman, could sue her employer for damages. *Id.* at 134, 316 A.2d at 552.

Recently, we limited the tort of wrongful discharge to "situation[s] where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980). We held in *Howard* that a termination due to sickness or age did not give rise to a cause of action for wrongful discharge. *Id.* at 297, 414 A.2d at 1274.

Our ruling in *Howard*, narrowing the concept of wrongful discharge, was consistent with the decisions in a majority of state and federal courts. These courts have allowed damages for wrongful discharge only when the discharge conflicted with a statute or clear-cut public policy. *See, e.g., Savodnik v. Korvettes, Inc.*, 488 F. Supp. 822, 826–27 (E.D.N.Y. 1980) (employee terminated in order to deprive him of pension benefits); *Tameny v. Atlantic Richfield Co.*, 610 P.2d 1330, 1336–37, 164 Cal. Rptr. 839, 846 (Cal. 1980) (termination for refusal to perform illegal act); *Petermann v. International Brotherhood, Etc.*, 174 Cal. App. 2d 184, 188–90, 344 P.2d 25, 27 (1959) (discharge for refusal to commit perjury); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 252–53, 297 N.E.2d 425, 428 (1973) (employee fired for filing workmen's compensation claim); *Fortune v. National Cash Register Co.*, 373 Mass. 96, 104–06, 364 N.E.2d 1251, 1258 (1977) (termination motivated by employer's desire to avoid payment of commission); *Nees v.*

*Hocks*, 272 Or. 210, 219–20, 536 P.2d 512, 516–17 (1975) (discharge because of jury duty service).

The courts have rejected suits for wrongful discharge when the determination of "wrongfulness" involved social and moral judgments properly falling within the employer's discretion. *See, e.g., Adler v. American Standard Corp.*, 432 A.2d 464, 471 (Md. 1981) (termination for disclosure of illegal practices does not constitute wrongful discharge); *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 75–76, 417 A.2d 505, 514 (1980) (private employer has right to fire employee for opposing continued research on a potentially dangerous drug); *Geary v. United States Steel Corp.*, 456 Pa. 171, 181, 319 A.2d 174, 178–79 (1974) (discharge of employee for voicing opinion to superiors that product unsafe held not within realm of public policy).

The majority decision departs from this trend of authority and limits the employer's right to make decisions regarding his business. I do not accept the establishment by the majority of a new social policy which sharply interferes with the employer's discretionary authority. I believe that an employee at will may be discharged with or without cause, unless he identifies a specific expression of clear public policy. *See Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. at 72, 417 A.2d at 512.

In the instant case the plaintiff has failed to identify a clear and strong public policy. The plaintiff's only argument is that insuring the safety of the employees working under him was the public policy objective of the action for which he was discharged. Specifically, he asserts that he was acting in accord with the general intent and provisions of the Occupational Safety and Health Act of 1970. 29 U.S.C. § 651 *et seq.* (1976). The Act states that "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious harm to his employees." *Id.* § 654(a)(1). The plaintiff argues that his actions in furtherance of the company policy against having less than two employees make bank deposits, and his adherence to the collective bargaining provision prohibiting employees from using their own vehicles for company business, were supported by a sufficient public policy to satisfy the test for wrongful discharge under *Howard.*

In determining whether a strong and clear public policy supports the actions of an employee in furthering the safety of his fellow workers, we must consider the nature and circumstances of the employee's actions. Although public policy may justify an employee's actions in some circumstances, a strong and clear public policy did not support the plaintiff's actions in this case. This is

not a dangerous workplace or premises situation. At the time of the break-in and theft, the plaintiff had voluntarily assumed the sole responsibility for safeguarding the money in the store, and he was compensated accordingly. The plaintiff clearly breached his agreed-upon duties when he failed to insure the safety of company funds. His actions, ultimately leading to the burglary, conflicted with his employer's desires and caused substantial damage to the defendant's business.

Furthermore, the risk involved in making unescorted bank deposits was not so great as to create a compelling necessity or urgency for the plaintiff's actions. Risks are common in many fields of employment and an employee is deemed to accept the risks inherent in his job when he voluntarily enters the employment relationship. The nature and circumstances of the plaintiff's actions thus do not warrant a finding that the actions were supported by a strong and clear public policy. The defendant's decision to terminate the plaintiff's employment fell within the ambit of its discretion under the employer-employee at-will contractual relationship. The trial court, therefore, should have granted the defendant's motion for a directed verdict.

I also disagree with the holding of the majority that the determination of public policy is within the province of the jury unless it "be so clear as to be established as a matter of law." No support for this proposition is offered and none can be found; all authorities hold to the contrary. *See generally*, 17 AM. JUR. 2d *Contracts* § 174-180. It has been been held that it is the function of the court to balance public and private interests and to weigh certain factors in determining whether the enforcement of a contractual term violates public policy as declared by the legislature. *Maryland-Nat., Etc. v. Washington Nat. Arena*, 386 A.2d 1216, 1228–29 (Md. 1978). I would hold that a public policy determination is one to be made by the trial court as a matter of law and not by the jury.