January 22, 1993
[NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1802

JOHN J. MACDONALD,

Plaintiff, Appellant,

v.

TANDY CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Francis J. Boyle,* U.S. District Judge]

Before

Selya, Circuit Judge,

Higginbotham,** Senior Circuit Judge,

and Cyr, Circuit Judge.

Andru H. Volinsky with whom Mary E. Davis, and Shaheen,

Cappiello, Stein & Gordon, P.A. were on brief for appellant.

Russell F. Hilliard with whom Ernest T. Smith, III, and Upton,

Sanders & Smith were on brief for appellee.

* Of the District of Rhode Island, sitting by designation.
** Of the Third Circuit, sitting by designation.

HIGGINBOTHAM, Senior Circuit Judge. This is an appeal

from a grant of a judgment n.o.v. in favor of defendant, Tandy

Corporation, and against plaintiff, John J. MacDonald. MacDonald

was fired from his job as a sales-trainee at a store owned by

Tandy in Manchester, New Hampshire because Tandy suspected that

MacDonald had stolen money from the store's cash register.

MacDonald brought an action against Tandy, alleging wrongful

discharge under New Hampshire law. MacDonald claimed that Tandy

fired him because he had cooperated with Tandy's theft

investigation. Cooperation with an employer's theft

investigation, according to MacDonald, is conduct protected by

New Hampshire public policy. Therefore, MacDonald argued his

firing was unlawful under New Hampshire law.

The action went to trial before a jury in the United

States District Court for the District of New Hampshire. The

jury returned a verdict in MacDonald's favor in the amount of

$101,000 damages. Tandy moved for a judgment n.o.v. and, in the

alternative, a new trial. The district court granted Tandy's

first motion, and entered a judgment n.o.v.. The court found

that MacDonald had failed to show that his conduct was protected

by public policy. The court also found that, even if MacDonald's

conduct was indeed protected by public policy, MacDonald had

failed to show that he was fired because of the protected

conduct.

MacDonald now appeals. Because we agree that MacDonald

failed to show that he was fired because of conduct protected by

New Hampshire public policy, we will affirm the district court's

grant of judgment n.o.v. in favor of Tandy.

I.

John J. MacDonald (MacDonald), who had been employed by

Tandy Corporation (owner of the Radio Shack stores) for six

years, was working as a trainee at the Radio Shack store located

in a shopping mall in Manchester, New Hampshire. On October 1,

1986, the store was closed at 9:43 p.m. by three Tandy employees,

David Jesperson (Jesperson), Al Aikens (Aikens), and Shirley

Cunningham (Cunningham). Jesperson, Aikens, and Cunningham left

the store together. As they left, the three employees set the

store's electronically controlled motion detection alarms.

At 9:47 p.m., Eastern Alarm, telephonically monitoring

the alarms from its offices in Portland, Maine, received a motion

alarm emanating from the Radio Shack store. Eastern Alarm called

the Manchester Radio Shack store by telephone but did not receive

an answer. Eastern Alarm received a second motion alarm two

minutes later. Eastern Alarm then called the Manchester Police

Department which dispatched a police unit to the store. Eastern

-3-
3

Alarm also called the store manager, Brad Ackerman (Ackerman),

but was unable to reach him. Eastern Alarm therefore called

MacDonald, the second person on the Radio Shack list of employees

to be called. In response to the call, MacDonald left home and

came to the Radio Shack store, arriving at approximately 10:35

p.m. In his work with Tandy Corporation, MacDonald had

previously responded to over thirty such alarm calls.

When MacDonald arrived, he was met by mall security

personnel and informed that the doors to the store were secure

and that it was safe to enter. MacDonald used a key supplied to

him by the store manager and entered the store alone. He

remained alone in the store for approximately fifteen minutes.

MacDonald reset the alarm, put a few things in order for the next

day, locked the front door, and left.

On the morning of October 2, 1986, MacDonald also came

in alone to open up the store for the day's business. MacDonald

discovered $530.02, including $200.00 petty cash, missing from

one of two cash drawers. He immediately notified Ackerman.

MacDonald also informed Bill Hanlon (Hanlon), a loss prevention

manager for Tandy Corporation, of the missing funds.

The police arrived and questioned MacDonald. Later,

both Ackerman and Hanlon arrived and began a separate

interrogation. They questioned Jesperson, Aikens, Cunningham,

-4-
4

and MacDonald individually. MacDonald stated that he did not

observe, either on the evening of October 1, 1986 or the morning

of October 2, 1986, when he opened the store, any signs of forced

entry, with respect to the rear or front doors or the cash

drawers. MacDonald also stated that he "did not notice if the

cash drawer was open when he went to the store on the night of

October 1, 1986."

During MacDonald's questioning, the subject of taking a

polygraph examination was raised. At trial, MacDonald testified

that he understood that Tandy wanted him to take the polygraph

and that Tandy planned to set up the polygraph exam. Further,

MacDonald understood that he would lose his career with Tandy if

he did not accede to the polygraph. On October 9, 1986,

MacDonald went to the Manchester Police Department for the

purpose of taking a polygraph examination with regard to the

missing funds. Officer Anthony Fowler conducted the examination

and scored it as a three chart cumulative total of -17 deceptive

and two chart cumulative total of -10 deceptive. In substance,

the conclusion was that MacDonald was not telling the truth.

MacDonald informed Radio Shack personnel of the polygraph

results.

On October 21, 1986, the home office of Tandy issued

orders that MacDonald was to be discharged. The reason for his

-5-
5

separation was stated as follows: "failed to clear integrity

investigation. See Loss Prevention Report and Manchester, New

Hampshire Police Report for details." Tandy's Loss Prevention

Report, prepared by Hanlon, noted the circumstances of the

disappearance of the money and that MacDonald had failed to clear

the polygraph test.

As noted above, the action went to a jury trial, the

jury returned a verdict in MacDonald's favor in the amount of

$101,000 damages, and the defendant moved for a judgment n.o.v.

The district court then certified the following question to the

New Hampshire Supreme Court:

Do the facts and circumstances of this action
support a finding that public policy
encouraged the action of the plaintiff, or
does public policy condemn any action which
the plaintiff refused to take in connection
with the termination of his at-will
employment by the defendant?

After the New Hampshire Supreme Court declined to respond to this

certified question, the district court granted the motion for

judgment n.o.v..

The district court reasoned that the record failed to

show that Tandy decided to terminate MacDonald's employment

because he cooperated in Tandy's investigation of the missing

funds. The court also reasoned that MacDonald's action in taking

the polygraph was not in cooperation with an investigation being

-6-
6

conducted by his employer but was rather in cooperation with an

investigation being conducted by the Manchester Police

Department.

II.

The district court had subject matter jurisdiction

pursuant to 28 U.S.C. 1332. We have appellate jurisdiction

prusuant to 28 U.S.C. 1291. In the First Circuit, a judgment

n.o.v. is reviewed under the same standard as a directed verdict:

[T]he evidence and all reasonable inferences
extractable therefrom must be examined in the
light most favorable to the nonmovant and a
judgment notwithstanding the verdict should
be granted only when the evidence, viewed
from this perspective, is such that
reasonable persons could reach but one
conclusion.

Veranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d

1364, 1383-84 (1st Cir. 1991).

New Hampshire law recognizes a wrongful discharge

exception to the common law rule of at-will employment as

follows:

[P]laintiffs must meet [a two-part test] to
establish a wrongful discharge cause of
action. First, the plaintiff must show that
the defendant was motivated by bad faith,
malice, or retaliation in terminating the
plaintiff's employment. . . . Second, the
plaintiff must demonstrate that he was
discharged because he performed an act that
public policy would encourage, or refused to

-7-
7

do something that public policy would
condemn.

Cloutier v. Great Atlantic & Pacific Tea Co., 436 A.2d 1140,

1143-44 (N.H. 1981); accord Short v. School Admin. Unit No. 16,

612 A.2d 364, 370 (N.H. 1992) ("To support a claim of wrongful

termination under State law, a plaintiff must establish two

elements: one, that the employer terminated the employment out

of bad faith, malice, or retaliation; and two, that the employer

terminated the employment because the employee performed acts

which public policy would encourage or because he refused to

perform acts which public policy would condemn.") (citation

omitted).

Resolution of the second prong of this test, whether

plaintiff's conduct for which he or she was discharged fell

within the parameters of public policy, is usually a question for

the jury:

[T]he existence of a `public policy' also
calls for the type of multifaceted balancing
process that is properly left to the jury in
most instances. . . . We believe it best to
allow the citizenry, through the institution
of the American jury, to strike the
appropriate balance in these difficult cases.

Cloutier, 436 A.2d at 1145. However, the jury's determination is

not entirely without bounds. "Although ordinarily the issue of

whether a public policy exists is a question for the jury, at

-8-
8

times the presence or absence of such a public policy is so clear

that a court may rule on its existence as a matter of law and

take the question away from the jury." Short, 612 A.2d at 370.

Even if the alleged conduct is determined to be

protected by a public policy, a necessary element of the

plaintiff's case is to prove that he or she was actually

discharged because of such conduct. Thus, a causal link between

the conduct established to be protected by public policy and the

reason for the allegedly wrongful discharge is necessary to

satisfy the second prong of the New Hampshire test. As the New

Hampshire Supreme Court stated:

[T]he plaintiff must demonstrate that he was
discharged because he performed an act that

public policy would encourage, or refused to
do something that public policy would
condemn.

Cloutier, 436 A.2d at 1144 (emphasis added). Where an employer

essentially penalized the employee for taking his regularly

scheduled day off, the court found "a sufficient nexus between

the public policy asserted by the plaintiff and the reasons for

his discharge." Id. at 1141; see also Cilley v. New Hampshire

Ball Bearings, Inc., 514 A.2d 818, 821 (N.H. 1986) (causation

element satisfied where plaintiff had alleged his termination

resulted from refusing to lie and that public policy supports

such truthfulness).

-9-
9

In this case, we agree with the district court that

there is no evidence on this record to demonstrate that the

plaintiff was discharged because of conduct protected by a public

policy. The specific public policy asserted by MacDonald as a

justification for upholding the jury's verdict is that of

"cooperation with an employer's theft investigation."

Interpreted in the light most favorable to MacDonald, the record

shows that MacDonald was suspected of stealing money from his

employer, cooperated in the employer's investigation, was not

cleared by the investigation, and was terminated. MacDonald was

suspected of stealing the cash from Tandy because of the

circumstances under which the money was taken from the store.

MacDonald then cooperated with his employer's theft

investigation, the result of which did nothing to dispel his

employer's suspicions. We believe the district court drew the

only possible interpretation from these facts when it concluded

that MacDonald was dismissed because of the opportunity he had to

steal the money and because he was not cleared by the subsequent

investigation and not because he cooperated with his employer's

theft investigation. What is missing from the record is any

evidence to indicate that MacDonald was fired because he

cooperated with the employer's theft investigation.

-10-
10

Without such causal linkage, MacDonald cannot assert an

exception to the at-will employment doctrine. We cannot accept

MacDonald's suggestion that his cooperation with his employer's

investigation immunizes him from the findings of the

investigation. It would defy logic if an employee by reason of

cooperation could be absolutely protected from the consequences

of the facts the cooperation yields. While it may not be the

best of business practice, a company is within its legal rights

to fire employees on such slender evidence indicating the

possibility of theft as is offered in the present case. See

Beery v. Maryland Medical Lab., Inc., 597 A.2d 516, 523-24 (Ct.

Md. Ct. Spec. App. 1991) (firing an employee on the basis of

unsubstantiated allegations can hardly be said to contravene any

clear mandate of public policy); Gillespie v. St. Joseph's Univ.,

513 A.2d 471, 472-73 (Pa. Super. 1986) (discharge of an employee

allegedly falsely accused of a crime of dishonesty not against a

clear mandate of public policy).

For the foregoing reasons, we will affirm the judgment

of the district court.

Affirmed.

-11-
11