Byrd v. Appalachian Mtn. Club          CV-95-625-JD   06/19/97
                    UNITED STATES DISTRICT COURT FOR THE
                            DISTRICT OF NEW HAMPSHIRE

<u>Betsy J. Byrd, et al.</u>

        v.                              Civil No. 95-625-JD

<u>Appalachian Mountain Club</u>


                            O R D E R


        The plaintiffs, Betsy and Roy Byrd, brought this action

seeking monetary relief related to the termination of Betsy

Byrd's employment with the defendant, the Appalachian Mountain

Club.  Before the court is the defendant's motion for summary

judgment on Betsy Byrd's wrongful termination claim (document no.

59).


                            <u>Background</u>[1]

        Betsy Byrd ("Byrd") began working for the Appalachian

Mountain Club ("AMC") in approximately 1966.  By 1990, her

responsibilities included serving as office manager at the AMC's

Pinkham Notch facility in Gorham, New Hampshire, and providing

secretarial and administrative support to the programs at the

Pinkham Notch facility.  In 1990, Byrd was promoted to the

position of Executive Assistant to the Director of Conservation

_____

        [1]The court recites all facts in genuine dispute in the light
most favorable to the plaintiffs.

Programs, Stephen Blackmer, in which, according to Blackmer, she was to be his "eyes and ears in the North Country."  Even after her promotion, Byrd continued to serve as the Pinkham Notch office manager and to provide support to the Pinkham Notch programs.

Although Byrd worked solely out of the Pinkham Notch facility, Blackmer spent significant amounts of time in the AMC's Boston, Massachusetts, and Concord, New Hampshire, offices.  In 1990 Blackmer hired Sarah Schmitt as a part-time office assistant in the Boston office, and in 1991 Schmitt began working full time.  Blackmer also hired Jennifer Melville in 1991 to work in Boston on the Conservation Department staff.  The parties dispute the extent to which Schmitt and Melville became responsible for Blackmer's administrative support after 1991.  According to Byrd, she maintained the same close working relationship with Blackmer even after Schmitt and Melville were hired.  According to the AMC, Schmitt assumed primary responsibility for Blackmer's schedule, and Melville assumed administrative responsibility over Blackmer's work with the Northern Forest Alliance, relying on Byrd for support.

In December 1992, Blackmer informed Byrd that, beginning in January 1993, she would be paid out of the budget of the AMC's education department, which was managed by Walter Graff.  In

2

completing Byrd's 1992 evaluation, Graff stated that he anticipated that Betsy "would perform more of the administrative assistant tasks that [he would] need." Blackmer Aff., Ex. 6. However, according to Byrd, Blackmer "made clear that even though the source from which [her] salary was being paid was changing, [Blackmer] was still [her] supervisor, [she] was still his Executive Assistant and that nothing as far as [her] employment position, circumstances[,] or responsibilities would change." Byrd Aff. ¶ 8.

In January 1993, Blackmer designated Byrd and Cindy Keach, Blackmer's administrative assistant at the Pinkham Notch facility, to oversee the hiring of a new trails director. Byrd and Keach frequently conferred with Blackmer during the application process.

On February 9, 1993, Byrd and Keach interviewed Paul Hannan, to whom Byrd has referred as Blackmer's "hand-picked candidate" for the trails director position. During the interview, Hannan made comments to Byrd and Keach of a sexual nature, which both Byrd and Keach considered offensive. Although Byrd and Keach reported the incident to Blackmer and AMC management, Blackmer informed Byrd that he did not believe the allegations she and Keach had made, and at one point attempted to convince Keach to approve of Hannan's hiring. Despite these efforts, Hannan was

3

not hired.

On March 17, 1993, Byrd, Keach, and another AMC employee received letters written by AMC's human resources manager. The letters were delivered in envelopes marked "personal and confidential" and advised the employees to keep the Hannan matter confidential.

Following her receipt of the March 17, 1993, letter, Byrd's contact with Blackmer virtually ceased. Blackmer took over responsibility for the application process for the still-vacant trails director position, stopped conferring with Byrd in making decisions about AMC conservation programs, ceased visiting her when he came to the Pinkham Notch facility, and declined to return her phone calls about matters related to Pinkham Notch programs.

In November 1993, Byrd and Keach, feeling as though they were being forced out of their positions, contacted the human resources manager to inquire if any severance packages might be available to them if they left the AMC. At some point thereafter, Byrd and Keach retained legal counsel, who, on November 19, 1993, drafted and sent to the AMC a letter expressing his clients' beliefs that their employment environment had been destroyed in retaliation for complaining about sexual harassment and that they had been forced out of their positions.

4

By memorandum dated November 29, 1993, and addressed to Byrd, Graff reiterated to Byrd that her "current job was [hers] to keep" and that the AMC was "not in any way asking [her] to leave," and informed Byrd of the AMC's willingness to resolve any of Byrd's outstanding concerns. In addition, the second-to-last paragraph of the memorandum provided:

> You mentioned that you had decided to leave and are working out the details with [the human resources manager]. If you have made a final decision, I will need to have a last date of work from you by Monday, December 6.

Byrd Aff., Ex. 23.

Byrd filed a discrimination charge with the EEOC on December 3 or 4, 1993. Although she did inform AMC management about her plans before December 6, 1993, she removed her personal effects from her office on that date. On December 7, 1993, Graff asked Byrd whether she had decided to leave the AMC. Byrd informed Graff that she had not yet made up her mind and informed Graff that she was not feeling well and would be leaving work for the day. On the morning of December 8, 1993, Byrd left a telephone message indicating that she was still ill and would not be reporting to work that day.

The same day, Graff circulated an AMC internal memorandum stating that Byrd had announced her resignation. Byrd became aware of this memorandum the following day and at some point

5

received a letter confirming her resignation. On December 16, 1993, Byrd's counsel drafted a letter to the AMC, stating that, contrary to the AMC's internal memorandum and confirmatory letter, Byrd had not previously announced her intention to leave the AMC. The letter also notified the AMC that Byrd was at that point terminating her employment as a result of "the AMC's continuing course of mistreatment against [her] in retaliation for her reporting a condition of sexual harassment against her and a co-employee."

The plaintiffs commenced the instant action on December 29, 1995. Their amended complaint alleges that the above-described facts constitute wrongful discharge under New Hampshire law, in that Byrd was constructively discharged in retaliation for complaining about sexual harassment.[2]

## Discussion

The AMC argues that summary judgment is warranted on Byrd's wrongful termination claim because Byrd was not constructively discharged. Specifically, it asserts that (1) any diminution in Byrd's responsibilities is not attributable to "shunning" by

---

[2]In amending their complaint, the plaintiffs expressly disavowed any reliance on Title VII as a basis for Byrd's retaliatory discharge claim. See Plaintiffs' Objection to Blackmer's Motion to Dismiss at 1.

Blackmer, but to a change in job responsibilities that predates the alleged sexual harassment; (2) that the change in Byrd's work environment following her allegations of sexual harassment would not have caused a reasonable person to resign; and (3) that Byrd did not explore all available alternatives before resigning. The plaintiffs dispute these contentions.

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiffs, "'indulging all reasonable inferences in that their

7

favor.'" <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)).  However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiff[s] "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

Under New Hampshire law, "an action for wrongful termination must include proof of bad faith, malice, or retaliation on the part of the employer, and proof that the employee was terminated for doing something that public policy would encourage or for refusing to do something that public policy would discourage." <u>Frechette v. Wal-Mart Stores, Inc.</u>, 925 F. Supp. 95, 98 (D.N.H. 1995) (emphasis omitted) (citing <u>Cloutier v. A. & P. Tea Co.</u>, 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)).  However, an employee need not be formally terminated in order to bring a wrongful discharge claim, and may instead present evidence that his or her "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign."  <u>Solt v. Seiler Corp.</u>, No. 92-572-SD, 1995 WL 30599, at *3 (D.N.H. Jan. 23, 1995) (quotation marks omitted) (adopting Title VII constructive discharge

8

standard); see, e.g., Monge v. Beebe Rubber Co., 114 N.H. 130, 134, 316 A.2d 549, 554 (1974) (upholding jury verdict on wrongful termination claim where employee was constructively discharged). Among the considerations a finder of fact may assess in determining whether working conditions are so unpleasant as to effect a constructive discharge are whether the employee has been demoted, whether the employee is humiliated or demeaned, whether the employee is forced to endure a discriminatory animus, and the degree to which the employer has placed pressure on the employee to resign. See, e.g., Greenberg v. Union Camp Corp., 48 F.3d 22, 27-29 (1st Cir. 1995); Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 563 (1st Cir. 1986).

Considered in the light most favorable to Byrd, the record before the court supports a finding of constructive discharge. Despite the defendant's assertions that Byrd's job responsibilities had changed prior to the Hannan incident, the evidence adduced by the plaintiffs suggests that Byrd was still Blackmer's executive assistant at the time the incident occurred and that certain responsibilities, including supervising the process of hiring a new trails director and assisting in making decisions about AMC conservation programs, were taken away from her after the incident occurred. In addition, Byrd has attested that Blackmer disbelieved and attempted minimize her allegations

9

of sexual harassment, and humiliated her by refusing to acknowledge her when he came to Pinkham Notch and declining to return her phone calls. Finally, the record indicates that the AMC circulated a memorandum announcing Byrd's retirement only days after informing her that her position was secure and only one day after she had stated that she had not yet made a decision about her future. Viewed as a whole, this evidence is sufficient to support a finding that a reasonable person in Byrd's shoes would have been compelled to resign.

The court's conclusion is not altered by the AMC's assertion that Byrd's failure to act as a reasonable employee before terminating her employment precludes her from claiming that she was constructively discharged. See, e.g., Hart v. University Sys. of N.H., 938 F. Supp. 104, 109 (D.N.H. 1996) ("[A] constructive discharge usually has not occurred where the employee first could have taken reasonable measures such as following the internal grievance procedure available at the workplace or filing a complaint with the EEOC before resigning."). The record indicates that Byrd's counsel wrote the AMC as early as November 19, 1993, to inform the AMC of the retaliation against Byrd and Keach for filing a sexual harassment complaint and of the women's "desire to avoid the necessity of filing charges against the AMC with the [EEOC] and state

10

agencies, and subsequent civil litigation concerning th[e] matter." Byrd Aff., Ex. 21. In addition, it appears that Byrd filed charges with the EEOC on December 3 or 4, 1993, several days before the AMC unilaterally announced her resignation. On the record before it, the court cannot conclude that Byrd failed to take appropriate action in response to the retaliation she has alleged.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 59) is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

June 19, 1997

cc:  Christopher E. Grant, Esquire
     Paul McEachern, Esquire
     Martha V. Gordon, Esquire

11