Bruning v. D.E. Salmon, Inc.          CV-03-352-JD  12/18/03
                    UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE


Keith Bruning

        v.                              Civil No. 03-352-JD
                                        Opinion No. 2003 DNH 221
D.E. Salmon, Inc.


                              O R D E R


     Keith Bruning claims that his former employer, D.E. Salmon,

Inc., wrongfully terminated him in retaliation for complaining to

a regional manager that other employees were using illegal drugs.

D.E. Salmon has moved to dismiss Bruning's first amended

complaint on the ground that reporting the drug use of fellow

employees to management is not an act which public policy

encourages and that Bruning has therefore failed to state a claim

for wrongful termination under New Hampshire law (document no.

12).  D.E. Salmon has also sought dismissal of Bruning's claim to

the extent he seeks non-economic damages on the ground that the

workers' compensation statute precludes such recovery.  Bruning

objects (document no. 13).[1]

_____

     [1]Bruning does not object to the dismissal of count II of his
first amended complaint, which seeks recovery under the New
Hampshire Whistleblower's Protection Act, Revised Statutes
Annotated ("RSA") 275-E.

## Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is one of limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Accordingly, the court must take the factual averments contained in the complaint as true, "indulging every reasonable inference helpful to the plaintiff's cause." Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992); see also Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989). In the end, the court may grant a motion to dismiss under Rule 12(b)(6) "'only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.'" Garita, 958 F.2d at 17 (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

## Background

The following facts are drawn from Bruning's first amended complaint (the "complaint"). D.E. Salmon operated a fish farm in Bristol, New Hampshire, where Bruning started working in 1980. At the farm, very small fish were placed in a series of tanks and grown until large enough to sell. Bruning had attained the rank of assistant manager at the fish farm by January 2001, earning

2

around $50,000 in annual salary and benefits.

In the summer of 2000, D.E. Salmon's regional manager, Dean Guest, met several times with employees at the Bristol facility. During these meetings, Guest stated that D.E. Salmon had a "zero tolerance" policy toward employee drug use. Apparently, this prompted Bruning to alert Guest "several times" over the course of the meetings that a number of employees did, in fact, use illegal drugs regularly, including while at work. Bruning alleges that "[g]iven the hazardous nature of some duties at the fish farm, the drug use created a serious risk of harm to [him] and the other workers." Bruning named the farm's manager, who was his immediate supervisor, as one of the "regular drug users."

Guest responded by asking Bruning to put his complaints in writing. Bruning obliged, supplying Guest with "two or three memos, roughly on a monthly basis, complaining of drug use by the manager and other employees." D.E. Salmon, however, took no action against any of these employees, who continued using drugs during working hours. In January 2001, after another employee complained to Bruning about drug use by fish farm personnel, Bruning telephoned Guest so that the employee could communicate his complaint directly. During this call, Bruning reiterated his own complaints about drug use by the manager and others.

A few days later, Guest visited the Bristol facility and met

3

separately with Bruning and the other employee who had complained about drug use at the farm. Bruning alleges that his co-complainant told Guest, in response to a question on the subject, that promoting Bruning to manager "would make the work environment and the work moral [*sic*] better." Nevertheless, on January 16, 2001, Guest returned to Bristol and fired Bruning, telling him that D.E. Salmon "did not need two managers for such a small farm . . . ." Bruning claims that he was better qualified than the then-manager, who ended up quitting two weeks after Bruning was fired. D.E. Salmon abandoned operations at the Bristol facility the next spring.

Bruning subsequently brought this lawsuit, claiming that D.E. Salmon wrongfully terminated him in retaliation for complaining about drug use by his manager and fellow employees. He alleges that public policy encourages reporting the drug use of co-workers, "particularly when such drug use may reasonably affect the health and safety of the drug users and/or their [other] co-workers." Bruning seeks lost wages and "non-economic damages caused by the wrongful termination."

4

Discussion

I.   Whether Bruning Has Alleged a Public Policy
     Sufficient to Support a Wrongful Discharge Claim

"To establish a wrongful discharge claim, a plaintiff must allege and prove that:  (1) the termination of employment was motivated by bad faith, retaliation or malice; and (2) that she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn."  Karch v. BayBank FSB, 147 N.H. 525, 536 (2002). D.E. Salmon contends that Bruning has failed to satisfy the second element of this test, arguing that public policy as a matter of law does not encourage "complaints to management of co-worker criminality."  Bruning responds that his complaints that employees used drugs at work "implicate public health and safety issues given the dangerous nature of the fish farming industry."

D.E. Salmon acknowledges that the existence of a public policy sufficient to support a wrongful discharge claim ordinarily presents a question for the jury.  Cilley v. N.H. Ball Bearings, Inc., 128 N.H. 401, 406 (1986); Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 924 (1981).  It nevertheless maintains that in this case, "the absence of such a public policy is so clear that a court may rule on its existence as a matter of law."  Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992).

5

In support of this argument, D.E. Salmon relies heavily on this court's decision in Bourque v. Town of Bow, 736 F. Supp. 398 (D.N.H. 1990), which it characterizes as holding that "complaints to management of co-worker criminality are not 'encouraged' by any articulated public policy."

It is true that the plaintiff in Bourque complained to his employer, the local board of selectmen, that his supervisor had engaged in conduct on the job which might have been illegal, namely "setting off firecrackers behind the plaintiff while he was in the process of completing a welding job." Id. at 400. The selectmen later fired the plaintiff after he expressed an inability to continue working under the supervisor. See id. The plaintiff in Bourque, however, does not appear to have alleged that this behavior posed a threat to workplace safety.[2] This fact alone distinguishes Bourque from the instant case, where Bruning claims that his fellow employees' drug use, apart from being illegal, made working at the fish farm more dangerous.

_____

[2]Although the plaintiff in Bourque alleged that his supervisor's misuse of firecrackers was part of a pattern of harassment which endangered his "health and life," he did not argue that the illegal activity itself posed a threat to his well-being. 736 F. Supp. at 400. Moreover, unlike Bruning, the employee in Bourque does not appear to have alleged that the apparent illegal activity jeopardized not only his own safety, but that of his fellow employees as well.

In fact, the plaintiff in <u>Bourque</u> does not appear to have argued that he was fired for complaining about his supervisor's illegal activity, or even sought to characterize the activity as illegal. Instead, he contended that he was wrongfully terminated for refusing to continue working with his allegedly ill-behaved boss, when public policy dictated that the selectmen fire his supervisor or at least investigate the charges against him. <u>See</u> <u>id.</u> at 402. The court disposed of this argument through the language on which D.E. Salmon now relies, concluding that the plaintiff was "complain[ing] about an internal, not public, policy . . . ." <u>Id.</u> Here, although Bruning's complaint suggests that D.E. Salmon should have retained him instead of the "drug using" manager, this personnel decision does not form the basis of his wrongful termination claim. <u>Bourque</u> therefore provides limited guidance in this dispute, where Bruning claims that D.E. Salmon acted contrary to public policy by firing him for complaining about his co-workers' drug use.[3]

D.E. Salmon also relies on a number of cases applying the law of other states in support of its theory that "an employee

_____

[3]The court finds similarly distinguishable the other cases cited by D.E. Salmon in which courts have ruled, as a matter of New Hampshire law, that the plaintiff's termination did not raise an issue of public policy. <u>See</u>, <u>e.g.</u>, <u>Frechette v. Wal-Mart Stores, Inc.</u>, 925 F. Supp. 95, 98 (D.N.H. 1995) (public policy does not encourage charging alcohol to company credit card).

report to company management of a co-worker's illegal conduct does not raise public policy concerns unless it implicates public health or public safety issues." This argument is irrelevant at this stage because Bruning has alleged that the unlawful activities of his fellow employees, i.e., using drugs during working hours, does raise public safety issues given the assertedly hazardous nature of some of the work at the farm. See Cloutier, 121 N.H. at 922-23 (declining to hold as a matter of law that no public policy encouraged manager to disregard company procedures which jeopardized the safety of his employees). The out-of-state cases on which D.E. Salmon relies are therefore inapposite.[4] See, e.g., Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1080 (9th Cir. 2003) (upholding summary judgment for employer where only interest served by reporting co-workers'

---

[4] Furthermore, as Bruning points out, these authorities apply a more stringent standard for determining the existence of a public policy than that used in New Hampshire. Compare, e.g., Mullins v. Int'l Union of Operating Eg'rs, 214 F. Supp. 2d 655, 667 (E.D. Va. 2002) (granting summary judgment on wrongful discharge claim based on reporting drug use by co-workers because "[o]nly if Maryland law compelled [plaintiff] to report drug use would she have a legally cognizable claim") (emphasis added) and Hayes v. Eateries, Inc., 905 P.2d 778, 789-790 (Okla. 1995) (requiring plaintiff to allege termination for performing an act "consistent with a clear and compelling public policy" or for refusing to act "in violation of an established and well-defined public policy") (emphasis added) with Cloutier, 121 N.H. at 922 (refusing to adopt "strong and clear public policy" as standard for wrongful discharge claim).

8

drug use to superior, prevention of crime, was insufficient public policy to support tortious discharge claim under California law); Fox v. MCI Communications Corp., 931 P.2d 857, 861 (Utah 1997) (public policy did not encourage reporting churning of customer accounts to employer when, though assertedly illegal, churning caused customers no harm).

This court has generally declined to determine the existence of a public policy as a matter of law in the context of a motion to dismiss a wrongful discharge claim. See, e.g., Sheeler v. Select Energy, 2003 DNH 123, 2003 WL 21735496, at *8 (D.N.H. July 28, 2003); Scerano v. Cmty. Corr. Corp., 2001 DNH 133, 2001 WL 873059, at *2 (D.N.H. July 19, 2001); Pooler v. Anheuser-Busch Recycling Corp., 1995 WL 839597, at *1 (D.N.H. Nov. 28, 1995); Peterson v. APV Crepaco, Inc., 1994 WL 269319, at *3 (D.N.H. June 14, 1994); Chamberlin v. 101 Realty, Inc., 626 F. Supp. 865, 867 (D.N.H. 1985); Fulford v. Burndy Corp., 623 F. Supp. 78, 80-81 (D.N.H. 1985); accord Cilley, 128 N.H. at 406 (reversing dismissal of wrongful discharge claim). Consistent with this approach, the court concludes that Bruning's allegation that public policy encourages a worker to alert his employer that his fellow employees are using drugs during working hours when the work in question is dangerous suffices to withstand a motion to

9

dismiss.[5]  D.E. Salmon's motion to dismiss Bruning's complaint in its entirety is therefore denied.

## II.  Whether the Workers' Compensation Law Precludes the Recovery of Non-Economic Damages for Wrongful Discharge

As Bruning points out, the New Hampshire Supreme Court expressly held in Karch that the exclusivity provision of the state Workers' Compensation Law, RSA 281-A:8, does not apply to claims for wrongful discharge.  147 N.H. at 537.  D.E. Salmon argues to the contrary despite its obvious awareness of Karch (which it cites in its memorandum for a related proposition) and without providing any basis for distinguishing or not following that binding precedent.  Such an argument is utterly lacking in merit.  D.E. Salmon's motion to dismiss Bruning's request for non-economic damages arising out of his termination is denied.

## Conclusion

For the foregoing reasons, D.E. Salmon's motion to dismiss Bruning's first amended complaint (document no. 12) is DENIED except as to count II, as to which it is GRANTED by assent. Pursuant to Fed. R. Civ. P. 15(a), D.E. Salmon shall file a

---

[5]In light of this ruling, the court need not reach Bruning's argument that RSA 275-E "provides a sufficient source of public policy on which [he] can rest his claim."

10

response to the first amended complaint within ten days of the date of this order.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

December 18, 2003

cc:  Michael J. Sheehan, Esquire
     Lawrence M. Edelman, Esquire