Geoffrey A. BURR, Plaintiff,

v.

The MELVILLE CORPORATION and Paul Cerasuolo, Defendants.

Civ. No. 94–111–P–C.

United States District Court, D. Maine.

Nov. 21, 1994.

Paula House McFaul, Portland, ME, for plaintiff.

Mark G. Furey and Thomas R. McNaboe, Thompson, McNaboe, Ashley & Bull, Portland, ME, for defendants.

*MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

GENE CARTER, Chief Judge.

In this case, Plaintiff Geoffrey Burr ("Burr") seeks damages from Defendants The Melville Corporation ("TMC") and Paul Cerasuolo ("Cerasuolo"), his former employers, resulting from Defendants' termination of Plaintiff on March 31, 1993. Defendant TMC owns a chain of drug stores known as "CVS" and Plaintiff was employed by TMC for twenty-one years, most recently as a District Sales Manager ("DSM") for CVS. This Court has before it Defendants' Motion for Summary Judgment, filed October 11, 1994 (Docket No. 19).

Plaintiff's nine-count Complaint seeks relief under several theories: breach of contract (Count I), promissory estoppel (Count II), breach of duty of good faith and fair dealing (Count III), wrongful discharge (Count IV), wrongful interference with business relationship (Count V), libel and slander (Count VI), negligent selection and training (Count VII), intentional infliction of emotional distress (Count VIII), and negligent infliction of emotional distress (Count IX). Defendants seek summary judgment on all counts. For the reasons discussed below, this Court will grant Defendants' motion with respect to all counts except Count VI, the claim for libel and slander.

The Court of Appeals for the First Circuit has articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754]

(1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989). Accordingly, this Court will review the record in the light most favorable to the nonmoving party here, Geoffrey Burr, drawing therefrom such inferences as are favorable to Plaintiff. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157–58, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). With this framework in mind, the following is a statement of facts considered by the Court in disposing of this motion.

## I. RELEVANT FACTS

Plaintiff was hired by Defendant TMC to work in CVS stores in 1972. He held several positions until he was finally promoted to DSM in 1981. At the time of his discharge from TMC in 1993, Burr's district consisted of eight stores, seven in New Hampshire and one in Sanford, Maine. Defendant Paul Cerasuolo is employed by TMC as a Regional Manager and became Plaintiff's immediate supervisor in 1990. Both Burr and Cerasuolo worked in the regional office of TMC located in Salem, New Hampshire. On January 29, 1992, Cerasuolo approached Burr with the suggestion that Burr consider other positions in the company such as store manager or auditor, either of which would constitute a demotion for Burr. At that meeting, Cerasuolo mentioned several problem areas in Burr's performance as a DSM, such as poor store appearance and unsatisfactory personnel management. Cerasuolo wrote a summary of the alleged problems with Burr's performance in a memorandum dated February 5, 1992, which he showed to Burr. At a meeting the following week, Burr declined to accept such a demotion and indicated that he wanted an opportunity to improve his performance as a DSM. Cerasuolo told Burr during that meeting that he had not decided conclusively that Burr would be terminated as a DSM.

Two months later, on April 9, 1992, Cerasuolo and Burr had another meeting at which time Cerasuolo gave Burr an unsatisfactory review with no increase in salary. At a meeting in October, 1992, Cerasuolo gave no indication that the problems discussed at the earlier meetings were continuing. Burr and Cerasuolo met again in February of 1993 when Cerasuolo pointed again to continuing problems with Burr's performance and warned Burr that, since the company does not provide for two consecutive unsatisfactory reviews, termination by the company could result if his performance did not improve. In early March of 1993, Burr met and talked with Jim Cote, a former regional manager about the difficulty with Cerasuolo. Burr also met with Jim Johnson, Cerasuolo's immediate supervisor. Despite improvements in some areas of his performance, such as "shrink" (unexplained merchandise loss), Defendants nonetheless terminated Burr on March 31, 1993. From the time in January of 1992 when Cerasuolo first mentioned problems with Burr's performance, Burr repeatedly requested documentation of the alleged problems, but none was ever produced by Cerasuolo. The profit and loss statements for the stores within Burr's district were given great weight in the decision to discharge him.

## II. DISCUSSION

### A. CHOICE OF LAW

■ A preliminary question for this Court is whether the law of Maine or New Hampshire should be applied in this diversity action. A federal court which exercises diversity jurisdiction over state-law claims must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Maine generally follows the *Restatement (Second) of Conflicts* in determining choice-of-law issues. *Ashmore v. Northeast Petroleum Div.*, 843 F.Supp. 759, 772 (D.Me.1994). The Complaint here sets forth claims that sound in contract and tort, requiring two choice-of-law analyses.

■ Regarding the contract claims, the standard provided by the *Restatement* requires the Court to determine what state has the "most significant relationship" to the transaction and parties. *Restatement (Second) of. Conflicts* § 188(1) (1971). In this analysis, a court should consider the following "contacts," to the extent that they are relevant to the issue: (1) place of contracting; (2) place of negotiation; (3) place of performance; (4) where the subject matter of the contract is located; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.* § 188(2).

■ Plaintiff's contract claims allege the creation of an implied contract, modifying Burr's unwritten basic employment contract, through the publication by TMC of the CVS Policy and Procedures Manual ("Manual").[1] After weighing all of the relevant factors above, the Court determines that New Hampshire law should apply. Although Burr was initially hired in Maine in 1972, he received raises and promotions throughout his twenty-one years of service which created, in essence, new at-will employment contracts with each change in the incidents of his employment. The formation of these subsequent employment contracts occurred, by and large, in New Hampshire. Since 1981, Burr has worked out of the regional office in Salem, New Hampshire. It was in Salem that all decision-making and discussions regarding his status as a DSM occurred. All but one of the stores where Burr actually performed his duties as a DSM were located in New Hampshire. The residence/domicile factor indicates that either state's law could apply since the parties are all residents of different states—Burr of Maine, TMC of New York, and Cerasuolo of Massachusetts. All three parties, however, had a "place of business" in New Hampshire. Accordingly, the law of New Hampshire will be used to evaluate the contract claims.

■ The parties do not dispute, and this Court agrees, that New Hampshire law should apply to the tort claims as well. The *Restatement (Second) of Conflicts* directs courts to consider which state has the most significant relationship to the occurrence and parties, considering the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Restatement (Second) of Conflicts* § 145. Unquestionably, any injury caused by Defendants occurred in the regional office in New Hampshire where all actions were taken and statements were made. As discussed above the domicile/residence factor suggests that New Hampshire should apply. Finally, the relationship between the parties was clearly centered in New Hampshire.

### B. BREACH OF CONTRACT (COUNT I)

■ It is undisputed that there is no express written contract between the parties regarding the duration of Burr's employment by TMC. Burr instead alleges that he had an implied contract with his employers to be terminated only "for cause" and that Cerasuolo lacked this cause when he fired Burr. The existence of this implied contract, Burr suggests, arose from a modification in his at-

---

1. This Court concludes below that no contract other than the ongoing at-will employment contract was formed. For the limited purposes of evaluating the conflicts-of-law issue presented, the Court has considered Plaintiff's allegations regarding the formations of an implied contract.

will employment status by the publication of the written termination procedures provided in the Manual. Defendants respond that the existence of the Manual did not affect the at-will status of Burr's employment relationship with CVS.

Both parties claim support for their positions from the recent decision of the Supreme Court of New Hampshire, *Butler v. Walker Power*, 137 N.H. 432, 629 A.2d 91 (1993). The plaintiff in *Butler* also claimed that he had an implied contract with his former employer, the terms of which were set out in an employee handbook. Specifically, the plaintiff sought damages for improper discharge when the employer failed to follow the termination "step procedure" set out in the handbook. The procedure, according to the plaintiff there, prohibited arbitrary discharge and created a tenured employment relationship. *Id.* at 92. Unlike this case,[2] however, there was no dispute in *Butler* that the plaintiff had signed an acknowledgement of the handbook's "disclaimer" to the effect that the handbook created no contract of employment. *Id.* at 91.

An earlier New Hampshire case had held that, absent any statement in an employment contract regarding its duration, an at-will status will be applied as gap-filler. *Panto v. Moore Business Forms*, 130 N.H. 730, 547 A.2d 260, 267 (1988). The *Butler* court emphasized that, when interpreting the effect of a manual on an employment contract, a distinction should be made between the durational status of an employee and "the incidents of employment such as compensation and fringe benefits." *Butler*, 629 A.2d at 93. The disclaimer in *Butler* negated any possibility that the terms of the handbook altered the at-will nature of the bare employment contract. However, the step discipline process, as an incident of employment, was enforceable, but it could not be interpreted as creating any sort of "tenure" or otherwise affecting the durational status of the employee. *Id.* at 94. Therefore, the plaintiff there

could recover only for the failure to follow the procedure but not for the discharge itself, "since the right to arbitrary termination, absent violation of public policy, remains in the hands of the employer." *Id.* Furthermore, the court concluded that there was no evidence of damages independent of the damages from the loss of continued employment.

■ Applying the concepts of the *Butler* case to the present motion, it is clear that, as a matter of law, Burr has failed to demonstrate a genuine issue of material fact regarding the breach of any term of an employment contract. The parties dispute which, if any, printed material provides the terms of any implied contract negating the at-will status of Burr. Assuming that, as Burr asserts, the Court should look to the Manual distributed to Burr in 1980, and further assuming that he never saw or knew of the 1991 disclaimer, there is no evidence from the language of that Manual that the parties intended to be bound by the provisions described therein. The interpretation of a contract is a matter of law for the court. "[I]n reviewing a contract, we will give its language the interpretation that best reflects the parties' intentions." *Butler*, 629 A.2d at 93. Unlike the language in the manual at the focus of *Butler*, the phrasing in the CVS Manual is decidedly precatory. The relevant language in the Manual for CVS employees provides, in pertinent part:

> A release is a termination at Company option.... [W]here counselling procedures fail to correct undesirable behavior or unacceptable work performance, or where serious violations of Company rules and regulations occurs, termination at Company option may be the final alternative.... Employees released *for inability to perform should have* at least two documented counselling sessions preceding the release and be given an adequate opportunity to improve.

---

2. The record on this motion reveals a dispute regarding whether TMC's 1991 distribution of a revised "Forward" for the Manual disclaiming any contractual effect from the provisions contained in the Manual prevents the creation of an implied contract here. Plaintiff alleges that, since he never received this revision, the disclaimer should not apply to him. While this question could be relevant in a case on different facts than this one, the Court's disposition here does not require the resolution of this issue.

Exhibit A, Affidavit of Paul Cerasuolo (Docket No. 21) (emphasis supplied). This language does not suggest any intent by the Defendants to be bound but is merely suggestive of the best way to conduct a termination.[3] Burr also alleges that a "list" following the language, "An employee may be 'released' from the company for the following reasons: ...," *id.*, binds Defendants to only *that* list of reasons, therefore prohibiting arbitrary discharge. There is nothing in the language of that section, taken as a whole, which indicates that such list was intended to be exhaustive. In fact, a "release" is only one type of termination described in that section. The list appears to operate more as a guide to classification of terminations, for the purposes of severance pay, than as a promise to fire only for cause.[4] In short, nothing in these documents provides the terms of an implied contract. Thus, even if Defendants had failed to follow the procedures outlined in the personnel policy, such failure cannot constitute a "breach of implied contract."

### C. PROMISSORY ESTOPPEL (COUNT II)

■ The analysis under this count is similar to that under the contract claim.[5] Under New Hampshire law, promissory estoppel is applied to enforce promises where consideration is lacking or as a remedy for one who relies upon an offer that is subsequently withdrawn. *Great Lakes Aircraft Co. v. Claremont*, 135 N.H. 270, 608 A.2d 840, 853 (1992). The theory operates to "impute contractual stature based upon an underlying promise, and to provide a remedy to the party who detrimentally relies on the promise." *Id.* As discussed above, Burr has failed to demonstrate any "promise" made to him by Defendants. It is also unclear what *detriment* may have occurred from any reliance by Burr. There is no evidence, for example, that Burr would have left the company during his twenty-one years of at-will employment and found another retail position that provided more job security. Absent these critical elements, Burr's claim fails.

### D. BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (COUNT III) AND WRONGFUL DISCHARGE (COUNT IV)

Although the plaintiff in *Butler* also brought a claim for relief under the theory of breach of implied covenant of good faith and fair dealing, the court did not discuss the claim as a separate action from the breach-of-implied-contract claim. Defendant asserts here that this claim is indistinguishable from Burr's wrongful discharge claim. Burr points to the leading New Hampshire case on wrongful discharge for authority that such a covenant of good faith and fair dealing is implied in all at-will employment relationships. *Cloutier v. Great Atlantic & Pacific Tea Company*, 436 A.2d 1140, 1143 (N.H. 1981). Accordingly, the two counts will be analyzed as a single wrongful discharge claim.

■ The *Cloutier* case, while finding that New Hampshire law does recognize actions for wrongful discharge, emphasized that the application and scope of the remedy is very narrow. To recover under a wrongful

---

**3.** In *Butler*, by contrast, the "Rules and Regulations" section of the handbook provided, in pertinent part,

> All employees *will be* given a fair and equitable warning as to their performance and conduct which might lead to their dismissal. In order to make sure this is accomplished; the following procedures *will apply* upon completion of your probation period....

*Butler*, 629 A.2d at 92 (emphasis supplied).

**4.** Compare the language in the employee manual discussed in *Cummings v. South Portland Housing Auth.*, 985 F.2d 1 (1st Cir.1993) (applying Maine law): "The employment of personnel and all actions effecting [sic] employees shall be based solely on merit, ability (performance), and justice." *Id.* at 2–3. Burr attempts to demonstrate on this motion that Cerasuolo's reliance on profit and loss statements was an inappropriate method of DSM evaluation. The "proper way" to evaluate managers is not relevant to the matters before this Court. Absent unlawful discrimination or a breach of contract, this Court will not disturb the employment decisions, rational or irrational, of private actors.

**5.** The New Hampshire Supreme Court has observed that promissory estoppel is simply another method to enforce written employment policies. *Panto v. Moore Business Forms*, 130 N.H. 730, 547 A.2d 260, 266 (1988).

366

discharge theory, a plaintiff must show both: (1) that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment, *and* (2) that the plaintiff was discharged because she or he performed an act that public policy would encourage, or refused to do something that public policy would condemn. *Id.* at 1143–44. Even if Burr were able to show that Cerasuolo acted with malice, there is absolutely no evidence in this record to suggest that a contravention of public policy was implicated in Burr's termination. The Supreme Court of New Hampshire has held, "Although ordinarily the issue of whether a public policy exists is a question for the jury, at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law." *Short v. School Administrative Unit No. 16,* 612 A.2d 364, 370 (N.H.1992). Such is the case here.

The facts here differ significantly from those in *Cloutier,* where the plaintiff was fired for failing to follow a company policy that placed his employees in serious danger and arguably violated the policy of the Occupational Safety and Health Act of 1970. *Cloutier,* 436 A.2d at 1144–45. Here, Burr's argument is, in essence, that a person with twenty-one years seniority should never be discharged arbitrarily. As the United States District Court for the District of New Hampshire observed, and this Court agrees, "although discharge may be harsh, unfair, or without good cause, unless there is a sufficient showing to support a factual finding that the management decision in question is contrary to a public policy, a discharge for business reasons is not actionable [under New Hampshire law]." *Vandegrift v. American Brands Corp.,* 572 F.Supp. 496, 499 (D.N.H.1983).

### E. WRONGFUL INTERFERENCE WITH BUSINESS RELATIONS (COUNT V)

Burr alleges that Cerasuolo interfered with Burr's business relationship with TMC by, *inter alia,* misrepresenting Burr's performance to TMC superiors and refusing to honestly evaluate Burr's performance as a DSM. To successfully recover damages resulting from a wrongful interference with business relations under New Hampshire law, Burr must demonstrate that he had a contractual relationship with another, that Defendants knew of that contractual relationship, and that the Defendants wrongfully induced the other party to breach the contract with Burr. *Montrone v. Maxfield,* 122 N.H. 724, 449 A.2d 1216, 1217 (1982). Here, there is simply no "other" party. Defendants *were* the only contracting parties to interact with Burr. Logically, "interfering" with the performance of Defendants' own contract with Burr is indistinguishable from breach, which has already been discussed above. The mere fact that Cerasuolo discussed his problems with Burr with other company officials does not make out the elements of this claim since it is not disputed that the decision to terminate Burr was Cerasuolo's alone to make. Defendant's Statement of Material Facts ¶ 23 (Docket No. 22). More importantly, however, there is no suggestion or evidence that Cerasuolo was acting other than as an agent for TMC at all relevant times. Therefore, Burr cannot proceed with this claim.

### F. LIBEL AND SLANDER (COUNT VI)

Burr's defamation claim arises from comments allegedly made by Cerasuolo to other CVS employees regarding whether Burr stole certain personnel records before leaving the company. While much of the affidavit of Burr presented on this motion does arguably recite hearsay that may be inadmissible at trial, Burr is competent to testify to the fact that, months after his termination, he received a phone call from a CVS employee who was trying to locate a personnel file. An inference can be made that such phone call was prompted by the suggestion of an employee of Defendants that Burr wrongfully held company records.

New Hampshire law recognizes a limited privilege in cases of slander when "the defamatory communication [is] made to a person whose knowledge of the defamatory matter because of his social or legal duty or his interest with reference thereto is likely to prove useful in the protection of the interest." *Jones v. Walsh,* 107 N.H. 379, 222 A.2d

830, 832 (1966). Such a privilege could be lost, however, if the privilege is abused. *Id.* Arguably, the employee who allegedly heard the defamatory remarks and acted on them had an interest in the information concerning the personnel records since he was trying to locate the records for a business purpose. However, the determination of whether Cerasuolo or any other TMC employee may have abused that privilege is a question of fact. *Id.* Accordingly, this Court cannot properly dispose of this claim on summary judgment.

## G. NEGLIGENT SELECTION AND TRAINING (COUNT VII) AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNT IX)

█ Burr also brings two negligence claims against his former employer: one for allegedly failing to adequately train and supervise Cerasuolo in the methods and procedures for counseling and termination of employees and another for the negligent infliction of emotional distress. New Hampshire statutory law is unequivocally clear that the effect of the workers' compensation statutory remedies is the creation of a presumption that employees

> have waived all rights of action whether at common law or by statute or provided under the laws of any other state or otherwise: (a) Against an employer or the employer's insurance carrier ... and (b) Except for intentional torts, against any officer, director, agent, servant or employee acting on behalf of the employer.

N.H.Rev.Stat.Ann. § 281–A:8(I) (1993). Plaintiff has presented no argument that this provision does not dispose of these two claims, and the Court cannot envision how the waiver provision could not apply here. Accordingly, these claims must fail.

## H. INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS (COUNT VII)

█ Burr also seeks relief under the tort of intentional infliction of severe emotional distress for the "course of conduct" by Cerasuolo. Memorandum of Law In Support of Plaintiff's Objection to Defendant's Motion for Summary Judgement at 20 (Docket No.

26). The Supreme Court of New Hampshire has recognized such a cause of action under New Hampshire law. *Morancy v. Morancy,* 134 N.H. 493, 593 A.2d 1158 (1991). The required showing by Burr must be that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Id.* 593 A.2d at 1159 (quoting *Restatement (Second) of Torts* § 46 (1984 & Supp.1990–91)).

█ Burr here has failed to establish any of the necessary elements of this tort. First, Burr has failed to demonstrate any "extreme and outrageous conduct" by Defendants. As this Court has previously noted, "[I]t is for the Court to determine, in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so." *Dempsey v. National Enquirer,* 702 F.Supp. 927, 930 (D.Me.1988), (quoting *Rubin v. Matthews International Corp.,* 503 A.2d 694, 699 (Me. 1986) (relying on *Restatement (Second) of Torts,* § 46, comment h, at 77)). Cerasuolo's conduct may have been insensitive or even rude, but it does not rise to the level of "extreme and outrageous conduct" that warrants recovery under this tort. *See also, Ball v. City of Cheyenne,* 845 F.Supp. 803, 814 (D.Wyo.1993) (granting summary judgment to employer-defendant when employee-plaintiff failed to show "extreme and outrageous" conduct by defendant); *Anspach v. Tomkins Indus.,* 817 F.Supp. 1499, 1507 (D.Kan.1993); *Bellios v. Victor Balata Belting Co.,* 724 F.Supp. 514, 520 (S.D.Ohio 1989).

Burr has also failed to demonstrate that he suffered any severe emotional distress as a result of Defendants' actions. As the Supreme Court of New Hampshire emphasized in *Morancy,* "severe mental distress is an essential element of the tort." *Morancy,* 593 A.2d at 1160. The record is barren of any reference to severe emotional distress. At worst, Burr was "shocked and dismayed" by Defendants' conduct. Affidavit of Geoffrey Burr, ¶ 34 (Docket No. 28). Absent a show-

ing of severe emotional distress, Burr's count for intentional infliction of severe emotional distress cannot stand.

### I. PUNITIVE DAMAGES

█ Finally, Defendants correctly point out that Burr cannot recover punitive damages under New Hampshire law. The Revised Statutes Annotated at section 507:16 provides in full, "No punitive damages shall be awarded in any action, unless otherwise provided by statute." Since Burr has failed to demonstrate any statutory basis for the punitive damages sought here, he cannot recover punitive damages. *See also Kenerson v. Stevenson,* 621 F.Supp. 1179, 1181 (D.Me. 1985) (denying punitive damages under New Hampshire law).

### III. CONCLUSION

Accordingly, Defendants' Motion for Partial Summary Judgment is *GRANTED* with respect to Counts I, II, III, IV, V, VII, VIII, and IX and is *DENIED* with respect to Count VI.

So *ORDERED*.