Robinson v. Caronia                    CV-92-306-B    01/04/96

UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Daniel C. Robinson</u>

     v.                                   Civil No. 92-306-B

<u>Caronia Corporation, et al.</u>


                         **O R D E R**

     Daniel C. Robinson brings an action against his former

employer, Caronia Corporation ("Caronia"), its client, Emergency

Medical Services Associates, Inc. ("EMSA"), and an EMSA employee,

Kenneth Schultz, alleging tort and contract claims arising from

the termination of his employment.  The defendants have moved for

summary judgment.  For the reasons that follow, I grant summary

judgment as to all claims against Caronia, and grant in part and

deny in part summary judgment as to the claims against EMSA and

Schultz.


                    **I.   BACKGROUND**

     Caronia operates an insurance adjustment business for a

number of clients, including EMSA.  Robinson was employed by

Caronia as a claims analyst and litigation supervisor.  As such,

he was responsible for investigating potential liability claims and issuing reports concerning his findings.

EMSA provided medical services to Massachusetts prison inmates pursuant to a contract with the Department of Corrections. In February 1992, Robinson was assigned to investigate a potential claim against EMSA arising from the death of an inmate at the state's Framingham correctional facility ("MCI-Framingham"). During the course of his investigation, Robinson interviewed the physician who had treated the inmate, three EMSA nurses and two correctional officers.

Shortly after Robinson completed his interviews, Schultz, EMSA's corporate medical director, called Charles Caronia, president of Caronia, to report that he had received a complaint concerning Robinson's handling of the investigation. Schultz told Mr. Caronia that he had been informed that Robinson had involved his wife in the interview process and had created a disturbance at the prison by attempting to blame correctional officers for the inmate's death.[1] Schultz contends that he told

---

[1] Robinson argues, and Caronia apparently agrees, that this information was relayed to Mr. Caronia in separate telephone calls on March 4 and March 5, 1992. Schultz and EMSA allege that the information was provided in a single telephone call on March 4, 1992. For purposes of this motion, I accept Robinson's

2

Caronia that the complaint had come from Department of Corrections officials and that he did not know whether the complaint was true. Mr. Caronia states that he did not question Schultz about the source of the complaint because Schultz was "emphatic" and "categorical" during the telephone conversation.

Mr. Caronia instructed Joseph D'Heron, a Caronia employee, to look into Schultz's complaint. D'Heron, in turn, spoke with Robinson's supervisor. After discussing the matter with Robinson, the supervisor informed D'Heron that Robinson denied bringing his wife to the interviews or creating a disturbance. Without conducting any further investigation, D'Heron decided to fire Robinson. The only explanation Robinson was given for his discharge was that he had breached Caronia's policy regarding confidentiality and EMSA was extremely upset.

On June 23, 1992, Robinson filed suit against Caronia alleging wrongful discharge, breach of contract, breach of the implied duty of good faith and fair dealing, misrepresentation, interference with an employment relationship, and defamation. Robinson brought a separate suit against EMSA and Schultz alleging defamation, interference with his employment, invasion

version.

3

of privacy, and intentional infliction of emotional distress. The two suits were consolidated, and all of the defendants have moved for summary judgment.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate only if the facts taken in the light most favorable to the nonmoving party show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3, 4 (1st Cir. 1994). Where the nonmoving party bears the burden of proof, the moving party initially need allege only the lack of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The nonmoving party cannot rely on the pleadings alone to oppose summary judgment, but must come forward with properly supported facts to demonstrate that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  I apply this standard in addressing defendants' motions.

## III.  DISCUSSION

I begin with Robinson's employment claims against Caronia: wrongful discharge, breach of the implied duty of good faith and fair dealing, breach of contract, and misrepresentation.  I then discuss the claims brought against all defendants: interference with an employment relationship and defamation.  Finally, I deal with the separate claims against EMSA and Schultz alleging invasion of privacy and intentional infliction of emotional distress.

### A.  Wrongful Discharge Claim

The elements of a wrongful discharge claim are

'one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn.'

Wenners v. Great State Beverages, Inc., 663 A.2d 623, 625 (N.H. 1995) (quoting Short v. School Admin. Unit 16, 136 N.H. 76, 84 (1992)).  The plaintiff bears the burden of articulating a public policy sufficient to support his cause of action.  Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 920 (1981).  Further, while the existence or nonexistence of a public policy generally presents a question of fact for the jury to decide, the question

5

may be resolved by the court as a matter of law if the evidence points so clearly in one direction that a reasonable juror could reach only one conclusion.  See Short, 130 N.H. at 84.

Although the evidence presented in the present case is sufficient to permit a reasonable juror to find that Caronia acted in bad faith, it will not support a finding that Caronia discharged Robinson because he either took some action which public policy would encourage or failed to take an action which public policy would condemn.  Further, Robinson's circular argument that he can prove the public policy element of his claim by demonstrating that Caronia discharged him in bad faith is meritless because it would render the public policy requirement superfluous.  Accordingly, Caronia is entitled to summary judgment on Robinson's wrongful discharge claim.

B.    **Good Faith and Fair Dealing Claim**

Robinson attempts to restate his wrongful discharge claim as a breach of the implied contractual duty of good faith and fair dealing.  However, in the context of the present case, his claims for wrongful discharge and good faith and fair dealing are indistinguishable.  Compare Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139-40 (1989) (employer violated duty of good faith and fair dealing owed to employee by "firing an employee out of

6

malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy") with Wenners, 633 A.2d at 625 (wrongful discharge claim includes both bad faith and public policy elements).  See also Burr v. Melville Corp., 868 F. Supp. 359, 365 (D. Me. 1994) (analyzing claims for wrongful discharge and breach of duty of good faith and fair dealing under New Hampshire law as a single claim).  Since Robinson cannot maintain a wrongful discharge claim, his good faith and fair dealing claim necessarily fails for the same reason.

C.   **Breach of Employment Contract**

Robinson next argues that Caronia's employee handbook and personnel manual[2] constitute an employment contract and that Caronia breached the contract by discharging him without complying with the company's disciplinary[3] and grievance[4]

---

[2]  I assume without deciding that the manual can be a source of contract rights even though Robinson never saw it during his employment because the handbook incorporates the manual by reference.

[3]  The handbook describes the company's disciplinary procedures as follows:

> Any employee who violates any of the
> Company's standards of job performance and
> behavior shall be subject to progressive
> disciplinary action or immediate termination
> where serious misconduct has occurred as

7

procedures.  Caronia contends that it is entitled to summary judgment on this claim because neither the handbook nor the manual alter Robinson's status as an at-will employee.

In New Hampshire, an employee handbook may modify an at-will employment relationship and create an enforceable unilateral contract if the handbook includes provisions recognized as an offer that the employee accepts by continued performance of his duties.  Butler v. Walker Power, Inc., 137 N.H. 432, 436 (1993); Panto v. Moore Business Forms, Inc., 130 N.H. 730, 735 (1988). However, an employer can disclaim a contractual obligation that would otherwise arise from the handbook by "clearly stating its intent not to be contractually bound by the terms of the promulgated policy."  Butler, 137 N.H. at 436.

---

outlined in the Personnel Manual.

The manual establishes a multiple-step disciplinary process that requires a "complete investigation" and a hearing before management can terminate an employee on a supervisor's recommendation.

[4] The handbook contains the following reference to the company's grievance procedure:  "Employees will be provided with an opportunity to present their complaints and appeal decisions by management though a formal complaint and grievance procedure." The manual outlines a multiple step grievance procedure with appeals to successive layers of management and a final appeal to a representative of "top management."

8

Caronia's employee handbook states in this regard:

> [N]othing in the handbook should be construed as altering the employment-at-will relationship or as creating an express or implied contract or promise concerning the policies or practices that the Company has implemented or will implement in the future.
> . . . .
> It is the policy of the Company that all employees who do not have a written separate, individual employee contract with the Company for a specific, fixed term of employment are employed at the will of the Company for an indefinite period.  Employees may resign from the Company at any time, for any reason, and may be terminated by the Company at any time, for any reason or for no reason, and with or without notice.
> . . . .
> This policy shall not be modified by any statements contained in this or any other employee handbooks, employment applications, Company recruiting materials, Company memorandums, or other materials provided to employees in connection with their employment.

The company's right to dismiss employees at any time for any reason or for no reason is further emphasized in the sections of the handbook and manual dealing with employee discipline. Finally, the company requires each employee to sign a letter acknowledging that he has reviewed the handbook and that he understands the handbook "does not represent in any way a contract between Caronia Corporation and myself."

The disclaimers contained in the handbook and manual are sufficiently clear to preserve Robinson's status as an employee-at-will notwithstanding any other employment rights he may have

under either the handbook or the manual.  See, e.g., Butler, 137 N.H. at 436-37 (disclaimer stating that handbook created "no contract of employment" sufficiently clear to preserve plaintiff's status as an employee-at-will).  Accordingly, Robinson cannot base a breach of contract claim on his termination since Caronia remained free to discharge him at any time for any reason.  See id. at 437 (employee-at-will cannot recover termination damages resulting from the employer's failure to follow disciplinary process specified in employee handbook).

Even though Robinson cannot base his breach of contract claim on his termination, he might be able to argue that Caronia breached its contractual obligation to follow its disciplinary and grievance procedures.  See id. at 436.  However, the only damages evidence Robinson has produced in support of such a claim is evidence of damages resulting from his termination.  Since I have already determined that Robinson cannot recover termination damages because he is an employee-at-will, Caronia is entitled to summary judgment on this claim as well.

D.  **Intentional Misrepresentation**

Robinson next contends that Caronia, through its agents, offered him assurances of continued employment that are actionable as intentional misrepresentations.  A claim of

10

intentional misrepresentation, otherwise known as fraud, requires proof that: (1) the defendant knowingly misrepresented material facts, (2) the defendant acted with the fraudulent intention that another person act on the misrepresentations, and (3) the plaintiff relied to his detriment on the misrepresentations. Caledonia, Inc. v. Trainor, 123 N.H. 116, 124 (1983); Procter v. Bank of New Hampshire, 123 N.H. at 359, 399 (1983); see also Patch v. Arsenault, 139 N.H. 313 (1995). Robinson argues that the following constituted actionable assurances of continued employment: (1) favorable performance evaluations, (2) promotions and increases in compensation, (3) promises of permanent employment, (4) the Handbook grievance procedures, (5) promises that the problems with EMSA would be resolved, and (6) promises of Caronia's support in spite of the problems with EMSA. Favorable evaluations, promotions, and increases in compensation are not assurances of continued employment particularly because of the clear statement in the handbook that Caronia's employees are employees-at-will. The only factual support Robinson offers for his claim that his supervisor promised him permanent employment is his contention that his supervisor told him two or three times during his six and one-half years with Caronia that "as long as I pleased him, kept him happy as a manager, then he

11

would take care of other problems if they came up and he would always take to me about these problems, if they came up." He then says that the supervisor never discussed a problem with him. The supervisor's statement, as reported by Robinson, does not rise to the level of a promise of permanent employment, and is consistent with the company's policy of at-will employment. In addition, even if the supervisor's statements could be taken as promises of permanent employment, Robinson has failed to show both that the supervisor knew the statements were false when he made them and that Robinson acted or refrained from acting in reliance on the promises. Finally, as I have already noted, nothing in the employee handbook could be construed as effecting a change in Robinson's status as an employee-at-will. Accordingly, Caronia is entitled to summary judgment on this claim.

**E.    Interference with Employment Relationship**

Robinson has brought claims for tortious interference with employment against Caronia, EMSA, and Schultz. New Hampshire recognizes a cause of action for tortious interference with economic or contractual relations. See Roberts v. General Motors Corp., 138 N.H. 532, 539 (1994); Montrone v. Maxfield, 122 N.H. 724, 726 (1982). To maintain this claim, Robinson must show

12

that: "`"(1) [he] had an economic relationship with a third party; (2) the defendant[s] knew of this relationship; (3) the defendant[s] intentionally and improperly interfered with this relationship; and (4) [he] was damaged by such interference."'" Demetracopoulos v. Wilson, 138 N.H. 371, 373-74 (1994) (quoting Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46 (1987) in turn quoting Emery v. Merrimack Valley Wood Products, Inc., 701 F.2d 985, 988 (1st Cir. 1983)). I examine the claims against each defendant in light of the applicable standard.

### 1. Caronia

It is undisputed that Caronia was Robinson's employer and the party with which he alleges a contractual relationship.[5] Thus, because Robinson's claim against Caronia does not involve a contractual relationship with a third party, one of the elements of the cause of action, it fails as a matter of law. See, e.g., Burr, 868 F. Supp. at 366; Alexander v. Fujitsu Business Communication Sys., 818 F. Supp. 462, 469 (D.N.H. 1993).

### 2. EMSA and Schultz

EMSA and Schultz move for summary judgment on the tortious

---

[5] Robinson alleges that Caronia acted through its agents. However, he does not allege the claim against the agents individually.

13

interference claims on the ground that Robinson's evidence does not establish that Schultz[6] intentionally or improperly interfered with Robinson's employment. The defendants argue that Schultz merely pressed Caronia to conduct a full investigation of what happened during Robinson's interviews at MCI-Framingham. They contend that there is no evidence that Schultz or anyone else from EMSA asked Caronia to fire Robinson or that Schultz pursued the investigation with improper motives.

To demonstrate that Schultz acted tortiously, Robinson must first "`show that the interference with his contractual relations was either desired by [Schultz] or known by him to be a substantially certain result of his conduct.'" Demetracopoulos, 138 N.H. at 374 (quoting Restatement (Second) of Torts § 767 cmt. d (1977)). If Robinson can successfully show that the conduct was intentional, he then must establish that Schultz acted with an improper motive, which under New Hampshire law is determined by reference to a list of factors provided in the Restatement (Second) of Torts § 767 (1977). Roberts, 138 N.H. at 540-41. Those factors are further developed in subsequent sections of the

---

[6] Because Schultz at all relevant times was the medical director of EMSA and acting as its agent, it is undisputed that his actions are construed as the actions of EMSA.

Restatement.  Id. at 541.

It is undisputed that Robinson was working on EMSA's behalf when he conducted the investigations at MCI-Framingham.  Thus, Schultz, as an EMSA employee, was entitled to inform Caronia of any credible report that Robinson was not performing his work properly.  However, neither Schultz nor EMSA was free to give Caronia intentionally false information concerning Robinson's conduct.  See Demetracopoulos, 138 N.H. at 374 (adverse report leading to plaintiff's termination by outside consultant could give rise to intentional interference claim if the report was knowingly false).

Robinson presents a weak case to support his claim that Schultz knew when he relayed the complaint to Caronia that no one had complained about him.  Nevertheless, Robinson, has presented enough evidence to survive defendants' summary judgment motion.  A reasonable juror could find from the evidence that Schultz told Mr. Caronia that EMSA had received a report that Robinson had brought his wife to the prison interviews and had created a disturbance at the prison by attempting to blame correctional officers for the inmate's death.  A reasonable juror could also find that Robinson neither brought his wife to the interviews nor caused any disturbance at the prison.  Moreover, since no EMSA

15

official can recall who complained about Robinson, and the prison official who was most likely to have done so denies having made a complaint, a reasonable juror could conclude that the complaint was never made. Construing this evidence in the light most favorable to Robinson, it is sufficient to permit a reasonable juror to conclude that Schultz intentionally made a false report to Caronia with the improper motivate of interfering with Robinson's employment. Therefore, summary judgment on this claim is denied.

## F. Defamation

Robinson alleges that Caronia, EMSA and Schultz defamed him with false accounts of the way in which he conducted the investigation. To prove defamation under New Hampshire law, a private individual plaintiff must show that the "defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mechanical Contractors, Inc. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118 (1993); accord Duchesnaye v. Munro Enters., 125 N.H. 244, 250 (1984) ("Liability in defamation actions has traditionally rested upon the defendant's intention to communicate the defamatory statement to someone other than the plaintiff, or at least upon negligent

16

responsibility for such communication.")  I address the claims against the defendants in turn.

## 1. Caronia

Robinson alleges that Caronia, through its employees, made defamatory statements about him both to unnamed Caronia employees and other third parties.  He has not, however, provided any factual support for his claim that Caronia made defamatory statements to any third parties.  He also acknowledges that an employer has a qualified privilege entitling it to communicate the reasons for an employee's discharge to other employees.  Therefore, he relies solely on the doctrine of "compelled self-publication" by which a defendant may be liable for defamatory statements communicated only to the plaintiff if the plaintiff has been coerced to repeat the statements.  See, e.g., Polson v. Davis, 635 F. Supp. 1130, 1147 (D. Kan. 1986) (applying Kansas defamation law), aff'd, 895 F.2d 705 (10th Cir. 1990).

Robinson candidly acknowledges that the New Hampshire courts have not addressed the doctrine of "compelled self-publication," but argues that I should follow precedent from other jurisdictions and adopt the doctrine in the public interest.  Because Robinson chose the federal forum and has invoked diversity jurisdiction, he cannot expect me "`to steer state law into

17

unprecedented configurations.'" <u>Federico</u>, 64 F.3d at 4 (quoting <u>Martel v. Stafford</u>, 992 F.2d 1244, 1247 (1st Cir. 1993)). Thus, I decline Robinson's invitation to expand the New Hampshire law of defamation to include the doctrine of "compelled self-publication." Because Robinson has failed to show that Caronia published the allegedly defamatory statements to third parties, as required under New Hampshire law, summary judgment is granted in Caronia's favor on this claim.

## 2. **EMSA and Schultz**

Robinson argues that EMSA and Schultz defamed him by repeating the false story that he had improperly brought his wife to the interviews and had created a disturbance at the prison. The defendants respond that their statements accurately conveyed what had been reported to them by others, and because they merely asked for further investigation, they were not making statements of fact. If Schultz accurately reported only what was reported to him, without embellishment, without having reason to know of its falsity, and merely asked for an investigation to determine what, if anything, happened, the point would be well taken. <u>See</u> Restatement (Second) of Torts § 581(1). However, as I have already explained, a reasonable juror could conclude from the evidence presented that Schultz knowingly misinformed Caronia

18

that a report of misconduct had been lodged against Robinson.

Under these circumstances, Schultz's statements might be

understood to be sufficiently factual to meet the "statement of

fact" element of defamation[7] and sufficiently culpable to meet

the tort's fault requirement.[8]

Next, the defendants contend that, even if the statements

were defamatory, they were entitled to a conditional privilege

due to the defendants' good faith in transmitting the complaint

to Caronia in the context of the business relationship between

the two companies.  See Simpkins v. Snow, 661 A.2d 772, 776-77

(N.H. 1995) ("a conditional privilege exists [to a defamation

claim] `if the facts, although untrue, were published on lawful

---

[7] To be actionable, the defendants' statements must be either false statements of fact or imply undisclosed defamatory facts.  See Duchesnaye, 125 N.H. at 249; Restatement (Second) of Torts §§ 565, 566 (1977).  Indirect statements of fact, those that are "reasonably capable of being understood as charging something defamatory," are also actionable.  Id. at § 565 cmt. b. See also Milkovich v. Lorain Journal Co., 497 U.S. 1, 20-21 (1990); Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 727-28 (1st Cir.), cert. denied, 504 U.S. 974 (1992).

[8] When the plaintiff is a private individual and "the substance of the defamatory statement `makes substantial danger to reputation apparent,'" the plaintiff must be able to show that the defendants' conduct was at least negligent.  Gertz v. Robert Welch, Inc., 418 U.S. 323, 348 (1974) (quoting Curtis Publishing Co. v. Butts, 388 U.S. 130, 155 (1967)).

19

occasion, in good faith, for a justifiable purpose and with a belief, founded on reasonable grounds of truth,' provided that the statements are not made with actual malice") (quoting Chagnon v. Union Leader Co., 103 N.H. 426, 437 (1961), cert. denied, 369 U.S. 830 (1962)). Since I have already determined that a reasonable juror could conclude from the evidence that defendants knowingly made a false report to Caronia, defendants cannot rely on the conditional privilege to support their summary judgment motion.

## G.    Invasion of Privacy:  False Light

The New Hampshire Supreme Court has stated in dicta that a plaintiff may maintain a tort for invasion of privacy based on "publicity which places the plaintiff in a false light in the public eye." Hamberger v. Eastman, 106 N.H. 107, 110 (1964). Robinson relies on this dicta in basing his invasion of privacy claim on Schultz's report to Caronia. Defendants contend that the evidence will not support a false light invasion of privacy claim because Robinson has not satisfied the tort's publicity requirement.

New Hampshire courts have not addressed the type or extent of publicity required to meet the tort's publicity requirement. However, the Restatement (Second) of Torts states in the context

20

of an invasion of privacy claim that publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D, cmt. a; see Moore v. Big Picture Co., 828 F.2d 270, 273 (5th Cir. 1987). Applying this definition in the present case, it is apparent that Robinson cannot satisfy the tort's publicity requirement. Therefore, defendants are entitled to summary judgment on this claim.

## H.   Intentional Infliction of Emotional Distress

Schultz and EMSA argue that Robinson's claim for intentional infliction of emotional distress is barred by his defamation claim based on the same allegations. See Young v. Conductron Corp., 899 F. Supp. 39, 40 (D.N.H. 1995); De Meo v. Goodall, 640 F. Supp. 1115, 1116 (D.N.H. 1986). Because I conclude that Robinson has failed to make a sufficient factual showing to support all of the elements of an intentional infliction of emotional distress claim, I need not decide whether the two claims can be pleaded as separate claims. Instead, I address the claim on its merits.

To support his claim for intentional infliction of emotional distress, under New Hampshire law, Robinson must show that

21

Schultz and EMSA (1) acted intentionally or recklessly, (2) their conduct was extreme and outrageous, and (3) as a result, they caused him severe emotional distress. See Morancy v. Morancy, 134 N.H. 493, 496 (1991) (quoting Restatement (Second) of Torts § 46 (1965)). The court may determine at the summary judgment stage whether the defendants' conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery." Restatement (Second) of Torts § 46 cmt. h (1965); accord Caputo v. Boston Edison Co., 924 F.2d 11, 14 (1st Cir. 1991) (deciding under Massachusetts law also based on § 46 of the Restatement)); Brewer v. K.W. Thompson Tool Co., Inc., 647 F. Supp. 1562, 1567 (D.N.H. 1986).

To meet the test, the defendants' conduct must have been so extreme and outrageous that it went "beyond all possible bounds of decency, and [would] be regarded as atrocious, and utterly intolerable in a civilized community." Restatement § 46 cmt. d; accord Jarvis v. Prudential Ins. Co., 122 N.H. 648, 652 (1982). If I infer from the facts that Schultz intentionally exaggerated and misrepresented the allegations about Robinson's interviews and the presence of his wife in his reports to Caronia for the purpose of inciting Caronia to fire Robinson, his conduct could not reasonably be found to be outrageous in the sense described

22

by the Restatement.  See, e.g., Gay v. Carlson, 60 F.3d 83, 89

(2d Cir. 1995).  Such conduct, while reprehensible, does not fall

to the level of atrocious or uncivilized behavior, particularly

when Robinson has not shown that he suffers from extreme and

severe mental distress[9] caused by Schultz's conduct.  See Orono

Karate v. Fred Villari Studio of Self Defense, 776 F. Supp. 47,

51 (D.N.H. 1991); cf. Godfrey v. Perkin-Elmer Corp., 794 F. Supp.

1179, 1187-90 (D.N.H. 1992) (finding outrageous conduct in

employer's sexual harassment of employee).  Thus, I grant summary

judgment in favor of Schultz and EMSA on Robinson's claim for

intentional infliction of emotional distress.

---

[9]  "`The law intervenes only where the distress inflicted is
so severe that no reasonable man could be expected to endure it.
The intensity and the duration of the distress are factors to be
considered in determining its severity.'"  Morancy, 134 N.H. at
496 (quoting Restatement § 46 cmt. j).  Robinson describes
depression and stress related to financial worries and problems
with re-employment.  He also states that he has experienced
"severe" headaches and insomnia, which he attributes to mental
distress following his discharge, but he does not provide details
of the extent or duration of his symptoms.  He explains that he
not sought counselling or treatment for mental distress because
he could not afford it.  During the summer of 1994, Robinson was
apparently able to teach summer school and was continuing to look
for further employment.  Based on the facts Robinson provides, I
conclude that no reasonable juror could find that Robinson's
distress was so extreme and severe as to be unendurable.

## IV.  CONCLUSION

For the foregoing reasons, defendant Caronia's motion for summary judgment, (document no. 34) is granted; defendants Schultz and EMSA's motion for summary judgment (document no. 35) is granted as to plaintiff's claims for "false light" invasion of privacy and intentional infliction of emotional distress, and is denied as to plaintiff's claims for interference with an employment relationship and defamation.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

January  4, 1996

cc:  Claudia Damon, Esq.
     Byry D. Kennedy, Esq.
     Joan Ackerstein, Esq.
     Peter Wright, Jr., Esq.
     Daniel Small, Esq.